IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## RANDY HAYES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Fentress County**
**No. 7509  Lee Asbury, Judge**

---

**No. M1999-00285-CCA-R3-PC  - Decided May 5, 2000**

---

This appeal arises from a guilty plea by the petitioner on two counts of kidnapping. Pursuant to the plea agreement with the State, the petitioner was sentenced to two concurrent twelve-year sentences on September 19, 1996.  On February 28, 1997, the petitioner filed a post-conviction petition alleging ineffective assistance of counsel and prosecutorial misconduct.  Following a hearing on May 15, 1998, the trial court denied and dismissed the petition on May 22, 1998.  After a careful review of the record, we affirm the trial court's dismissal of the petitioner's petition.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

GLENN, J., delivered the opinion of the court, in which RILEY, J., and WITT, J., joined.

Gregory D. Smith (on appeal), Clarksville, Tennessee, and Charles Allen, Assistant Public Defender (at trial and on appeal), Oneida, Tennessee, for the appellant, Randy Hayes.

Paul G. Summers, Attorney General and Reporter, Lucian D. Geise, Assistant Attorney General, William Paul Phillips, District Attorney General, and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 14, 1996, the Fentress County Grand Jury indicted the petitioner, Randy Hayes, for two counts of especially aggravated kidnapping and, alternatively, two counts of aggravated kidnapping.  On September 19, 1996, the petitioner pled guilty to two counts of kidnapping and was sentenced to two concurrent twelve-year sentences.  On February 28, 1997, the petitioner filed a petition for post-conviction relief, alleging ineffective assistance of trial counsel and prosecutorial misconduct.  A hearing on the petition was held on May 15, 1998, and the trial court dismissed the petition on May 22, 1998.  The petitioner appealed to this court on a single issue: whether trial counsel was ineffective by rendering improper advice, performing an inadequate investigation, and by coercing the petitioner into pleading guilty.  After a careful review of the record, we affirm the trial court's dismissal of the petitioner's post-conviction petition.

# FACTS

At the plea proceedings on September 19, 1996, the petitioner stipulated that, on or about January 30, 1996, he knowingly kidnapped the victim on two separate occasions by means of force and threat, the second occasion occurring after the victim escaped from the first kidnapping. The State and the petitioner stipulated that the testimony of the witnesses would have been as follows:

The victim, who had been divorced from the petitioner approximately a week before the incident, would have testified that the petitioner came to her place of employment in Jamestown around 7:00 p.m. on January 29, 1996, and grabbed her by the collar as she was going out the door. He took her to a back room, where he struggled with her and threatened to kill her with a pair of scissors. When she sprayed him with pepper spray, he became enraged and began hitting her in the chest and head. He knocked her down, put his knee in her chest, and continued hitting her in the head. The struggle continued into the bathroom, where the petitioner washed out his eyes while still holding the victim by the collar. He then dragged her into another area and bound her head and mouth with tape. As he drove the victim away in her white Monte Carlo, he threatened to stab her with the scissors if she screamed or drew attention to herself. The victim described the route that the petitioner drove from Fentress County into Morgan County. As he drove to an area in Morgan County with a pond, he continued his threats to kill the victim for leaving him for another man. The petitioner stopped the car and shoved the victim onto the hood as she was fighting back. He tore the tape off her head and mouth and shoved her into the front seat of the car. He ordered her to take off her clothes as he pointed the scissors at her neck. The victim was cut when she reached for the scissors. The petitioner took off his clothes and vaginally raped the victim.

The petitioner then drove the victim back toward Jamestown and stopped at Mitchell's True Test Gas Station in Fentress County to buy gas. While there, he talked to the attendant. The victim ran from the car yelling that she had been raped and for someone to call the police. Gary Jennings was inside the gas station. The petitioner grabbed the victim and dragged her back to the car. He told her he would have to kill her and himself, because she had involved the police. According to the victim, the attendant and Gary Jennings did nothing to stop the petitioner.

He drove the victim back to the pond area in Morgan County, where he again beat her and raped her anally and vaginally in the front seat of the car. The victim talked to the petitioner for a while, but he was still threatening to kill her. She laid with the petitioner in the car and fell asleep. When she awoke around 5:30 a.m., the petitioner was calmer but raped the victim again in the backseat. She did not resist this time. As they drove back, the victim tossed the scissors out of the car window near a green house with a carport. The petitioner stopped in front of Choates TV on Rugby Avenue and told the victim he would see her at 7:00 p.m. and threatened to kill her again. The petitioner got out of the victim's car and walked down Wright Street. The victim went to her place of employment and called the sheriff's department.

The testimony from Danny Stephens, a True Test Gas Station employee, would have substantiated the victim's account of the events at the gas station. Stephens wrote down the license plate number of the victim's white Monte Carlo that was driven by the petitioner and called the

police. Pieces of the office door lock that the petitioner broke while retaking the victim were given to the sheriff's department. Stephens knew the petitioner as a customer before this incident.

Dr. Jonathan Allred, who examined and treated the victim at the Fentress County General Hospital, would have testified from his medical report showing injuries to the victim, including an abrasion on her thumb that the victim attributed to the scissors. Dr. Allred performed rape protocol and the procedure for a rape kit. John Adams, a serologist with the Tennessee Bureau of Investigation Laboratory, would have testified that he analyzed the anal and vaginal swabs taken by Dr. Allred in the rape kit and concluded that sperm and semen were present in both swabs.

The parties stipulated that if Truman Creselious, chief deputy of Fentress County, was called as a witness, he would have testified that he arrived at the victim's place of employment on January 30, 1996, and found the victim there. She was upset, and he took her to the hospital. Deputy Creselious took possession of the rape kit at Dr. Allred's office and found medical tape with large portions of the victim's hair stuck in it, which would substantiate the victim's story.

Finally, Jeff Hancock, investigator with the Fentress County Sheriff's Department, would have testified that he found the scissors at the location where the victim stated she had thrown them out of the car window. He also recovered the lock from the gas station that the petitioner damaged when he forced his way into the office to remove the victim the second time.

After determining that the petitioner's plea was voluntary and knowing, the trial court sentenced the petitioner as a Range III persistent offender to two twelve-year sentences at forty-five percent for the kidnapping convictions. The court noted that, as part of this agreement, the Morgan County prosecutor would recommend an identical sentence be given the petitioner on the companion rape charges, if he pled guilty to aggravated assault. These sentences were to run concurrently. On February 28, 1997, the petitioner filed a post-conviction petition challenging the plea and his attorney's representation.

On May 15, 1998, the trial court held a hearing on the petitioner's petition for post-conviction relief. The petitioner called his trial attorney, Kelly Williams, as his first witness. Ms. Williams was retained by the petitioner to represent him in Fentress County on the kidnapping charges and in Morgan County on rape charges related to this same event. Ms. Williams testified that, prior to the preliminary hearing, she met with the petitioner on February 26, March 18, and March 26, 1996. The petitioner maintained that the victim, his ex-wife, went with him voluntarily and had consensual sex with him on the date of the alleged offenses. Ms. Williams stated that she investigated the case by extensively cross-examining the State's witnesses at the preliminary hearing, having her associate (Darrell Colson) interview witnesses, talking with the petitioner's family, viewing photographs of the crime scene, car, and the victim's injuries, reviewing medical reports, and reviewing statements of the victim. She admitted that she did not interview Dr. Allred, who examined the victim at the hospital. However, Ms. Williams did not feel that the doctor could testify with medical certainty to anything that would be helpful to the petitioner's case, such as whether the victim was raped or had consensual sex. The petitioner never denied having sex with the victim. According to Ms. Williams, the petitioner explained the victim's physical injuries by stating that the

victim fell down in the woods while they were together in Morgan County, a version Ms. Williams found to be implausible considering the photographs of the victim's injuries and testimony of witnesses.

The petitioner was arraigned in Fentress County on May 24, 1996. In the week following, Ms. Williams looked over the discovery provided by the prosecution and the test results from vaginal and anal swabs performed on the victim at the hospital which showed the presence of sperm. Ms. Williams testified that the petitioner's mother was very emotional about the whole situation, and Ms. Williams did not want to lead the petitioner's mother to believe her son would be acquitted when she felt he would be convicted. When Ms. Williams saw the strength of the prosecution's case, she stated that she essentially gave up and wanted the petitioner's family to understand that the petitioner was probably not "going to get off on these charges." On May 30, 1996, Ms. Williams wrote a letter to the petitioner's mother in which she stated:

> From what I have already discovered in investigating your son's case, it would appear that it will be very hard to prove him innocent or negotiate a plea that he would even consider.

Ms. Williams recalled that her associate, Darrell Colson, talked to the family a day or two before the trial was scheduled to begin on September 19, 1996; however, she denied telling the family that DNA tests had been performed that would convict the petitioner. She had previously sent copies of all the discovery and test results that she had been given in the case. Ms. Williams also denied that the petitioner and his family made repeated requests for either the tape or transcript of the preliminary hearing. The only request she could recall came in a letter from the petitioner after the plea had already been entered and he was in prison. Ms. Williams was not aware that the petitioner's mother had taped conversations with her.

Prior to the trial date, Ms. Williams had taken a number of plea offers to the petitioner, but he had rejected all of them. On the day of trial, the petitioner appeared in his suit, ready for the proceedings. He told Ms. Williams that he wanted to go to trial. Ms. Williams again took five or six different plea offers for the petitioner to consider and each time he rejected the offer. She described the final moments before the petitioner decided to plead guilty:

> Q. And you came out and got his mother and other family members and took them into the back and basically told him – he was going to be spending life in prison if he didn't take this and his mother began crying and the family, and then finally after her crying and going on he says – I can't see mama like this, and he says – I'll do it?
>
> A. Well, I didn't tell him he would spend life in prison, but I told him he would be subject to getting several years in prison, and that that was in his best interest – I felt it was in his best interest and I wanted to be sure – I – I talked to him

for a long time before I went and got his mother and brothers and sisters, but his mother had been – she called the office almost every day about Randy and I wanted her to be – to know what was going on. I didn't do it for a reason to coerce him to do anything. I don't make any of my clients plead anything. I was the one that recommended that Randy get dressed up, get his hair cut and be ready for trial. I didn't coerce him into pleading anything.

. . . .

Q. Until you brought his mother back there and told her he was going to be spending his life in prison and had her all crying and upset, he had said – no, had he not?

A. Well, he had said – no, but I don't know that he had said – absolutely no at the point that I went and got her. I can't remember exactly what his situation was at that time.

. . . .

Q. [D]id you tell him that there was a test [DNA] that showed there was 99 plus percent probability that it was him?

A. I told him they had a test result that showed that she had been – had sex, both anally and vaginally, that they had sent off samples from the hospital and I showed him the test results there and sent them to them anyway. . . . I don't know if I showed them–told them any kind of percentage. . . . I may have, I can't recall.

. . . .

Q. Do you recall telling them that that test alone would be sufficient to convict him and cause him to spend virtually his life [in prison]?

A. I – I don't recall telling them that. I know that if that test would have went [sic] in front of the jury, that a lot of people would have been offended by him raping – having sex with her anally, and that that would have hurt his case, and that is what I told them.

Ms. Williams then read from the hospital report recounting the victim's injuries but showing no signs of gross bleeding or tears in the vaginal or anal areas. She stated that this was not proof that sex was consensual, and the doctor could not have testified whether or not the sex was consensual. Ms. Williams read from file notes that indicated that her associate had interviewed a witness, Darrell Gunter, who confirmed a friendly phone conversation from the victim to the petitioner. Gunter's name had been given to Ms. Williams by the petitioner, but she could not recall if this information would have corroborated the petitioner's version of the events.

On cross-examination, Ms. Williams testified that all of the witnesses who were likely to testify at trial, with the exception of the doctor and the lab technician, testified at the preliminary hearing. She felt that the victim was so specific in her testimony at the hearing that she made a very believable witness. Ms. Williams agreed that she received evidence from the prosecution that would have negated the petitioner's theory of consensual sex, such as copies of the petitioner's four prior felony convictions for larceny and battery and the fact that the victim had obtained an order of protection against the petitioner less than a month before the kidnapping occurred. The petitioner claimed that the victim called him and wanted to meet him on the date of the offenses, but Ms. Williams testified there was no evidence to support this version, and the victim contradicted his story at the preliminary hearing. Ms. Williams agreed that it would have been necessary for the petitioner to testify to follow his theory of the events.

Ms. Williams agreed that the petitioner theoretically could have been sentenced to as much as fifty years at eighty-five percent on the especially aggravated and aggravated kidnapping charges, if the judge ordered the sentences to be served consecutively. Ms. Williams testified that she told the petitioner all of this. She had also negotiated a plea as part of this plea agreement on the Class A felony rape charges in Morgan County.[1] Those charges were to have been reduced to two Class C felonies of aggravated assault, to run concurrently with the Fentress County kidnapping charges.[2] She agreed that, even if the jury only found the petitioner guilty of two counts of simple kidnapping, he could have theoretically been sentenced to thirty years at forty-five percent as a persistent Range

---

[1]On redirect, Ms. Williams testified that she did not enter the pleas in Morgan County before she filed her lawsuit for fees and withdrew, even though the plea proceeding was in September 1996, and the post-conviction petition was not filed until February 1997. She explained that it was very difficult getting dates from Morgan County, and the delay was not her fault or the petitioner's.

[2]As of the date of the post-conviction hearing, this portion of the agreement was not completed. Ms. Williams testified that the petitioner was scheduled to enter a plea on the Morgan County charges the week after his plea in Fentress County, but the proceeding was rescheduled. Before the plea could be entered in Morgan County, the petitioner discharged Ms. Williams as his attorney after he filed a post-conviction petition alleging ineffective assistance of counsel. His mother also filed a counter-suit against Ms. Williams for attorney's fees. In a discussion between the bench and the attorneys, the petitioner's post-conviction attorney informed the trial court that Morgan County was not proceeding with the plea agreement on the rape charges, because of the post-conviction petition filed in Fentress County on the related kidnapping charges.

III offender. As part of the plea agreement, the State agreed to give the petitioner jail credit back to his arrest in January of 1996, even though he was serving time for violation of probation in another county. Ms. Williams testified that neither the petitioner nor his family gave her any information that would have been helpful to his case.

The next witness to be called on behalf of the petitioner was his mother, Norma Hayes. She testified that she retained Ms. Williams for the petitioner, who was in jail at the time. Mrs. Hayes stated that she was involved in a number of discussions with Ms. Williams and once with Ms. Williams's associate about the case. Two days before her son was scheduled to go to trial, Ms. Williams's associate told Mrs. Hayes that the prosecution had blood tests that matched the petitioner's blood type 99.9 percent. Mrs. Hayes was surprised at the change, because Ms. Williams had previously indicated at the preliminary hearing that the prosecution did not have any evidence and that this was a "joke." Mrs. Hayes stated that Ms. Williams did not tell her about any discovery materials she had at the preliminary hearing, and she did not see Ms. Williams between the preliminary hearing and the trial. On the day of the trial, Mrs. Hayes described the scene with the petitioner:

> Kelli [sic] Williams came out and got me, and she took me back in the back room here and Randy [the petitioner] was back there with Darrell Colson [Ms. Williams's associate] and I walked in, and he said – mom, they have offered me several different plea bargains this morning, but I am not going to take them. I am not guilty, and I am not going to take them. I have told them all along I am not going to take them. And she said – Mrs. Hayes, I am going to talk to you like you are my mother and that was my brother. Randy is going to be found guilty today. And I said – how do you know that, I thought that was up to the judge and the jury and she said – it is, but they have too much evidence. And Darrell Colson spoke up and said – and I overheard one of your witnesses saying that they was going to screw you up on the – on the stand. And then Kelli [sic] Williams spoke up and said – Mrs. Hayes, he will never see freedom again. Well, it tore me all to pieces. I started crying and Randy got up and went in the bathroom, he stayed a minute, and he came back out and he had tears in his eyes and he – and I said – son, I don't want to see you to go to jail at all, 'cause she had already made a plea bargain, she said – six (6) years, he would get six (6) years, and Mr. Galloway had agreed that if he would plead guilty, sign the plea bargain for the rape and the kidnapping, which would run concurrent, that he would get six (6) years. And Randy–I was sitting there crying and I said . . . I know you are not guilty, and I don't want to see you go, but I said – I would rather see you take six (6) years than to spend the rest of your life behind bars. And he sat there for a minute, like he was in deep thought and he said – well, I'll sign it, I don't want to, but I'll sign it. And so he signed the plea bargain and that – that was it.

. . . .

> First she [Ms. Williams] said six (6) years and then when he signed the plea bargain, she said that it would be twelve (12) years at forty-five (45%) percent.

Although Mrs. Hayes did not have a tape of the conversation that morning, she did have a tape of a conversation she and the petitioner had with Darrell Colson two days before the trial.[3]

During cross-examination, two letters from Kelly Williams were received into evidence, one dated September 13, 1996, and the other dated September 16, 1996, which conveyed plea offers. Mrs. Hayes admitted that her son filed his post-conviction petition before he appeared for arraignment on the Morgan County rape charges. She admitted that the petitioner never told the Morgan County court or the public defender assigned to his case that he wanted to plead guilty in Morgan County under the arrangement in the Fentress County plea agreement.

The petitioner testified on his own behalf. He stated that he turned himself in to authorities and was arrested. Ms. Williams came to see him approximately three times at the jail. According to the petitioner, the only thing Ms. Williams talked to him about was plea bargains, and he did not want a plea bargain. He stated that he gave her names of people to interview for his case, including the victim, Danny at the gas station, some people at Challenger's [where the victim worked and the first kidnapping allegedly took place], his brother, his mother, his sister, and his sister's boyfriend. The petitioner admitted that the victim and the people at the gas station testified at the preliminary hearing. He thought his family members would have testified that the victim had been seeing her "ex," and this evidence would show that he had been "set up." The petitioner claimed that the victim telephoned him to say that she loved him and wanted to get back together. He stated that she squirted mace in his eyes as he opened the door at Challenger's to meet her. According to the petitioner, a struggle ensued over the mace, and his knee accidentally hit the victim when he tackled her in the struggle. He claimed he went to Challenger's to talk to the victim about taking their children to church and that he had talked to the victim on his sister's phone every night for two weeks prior to the incident. The petitioner stated that he gave Ms. Williams the names of persons who knew that the victim had been calling him, but she never told him she interviewed any of them.

The petitioner testified that, after the preliminary hearing, Ms. Williams told him and his mother that the blood tests were inconclusive, as if the samples came from two different people. He stated that the victim testified at the preliminary hearing that she had slept with the petitioner and another man the same night. The petitioner testified that Ms. Williams showed him "a bunch of

---

[3]The trial judge played the tape in open court before the conclusion of the post-conviction hearing. Ms. Williams identified the voices on the tape as hers and those of Darrell Colson, Wade Hayes, Mrs. Hayes, and Joyce Garrett. The petitioner identified the voice "behind the glass" at the prison visitor's center as his. After listening to the tape, the attorneys agreed with the court that there was nothing in the taped conversation regarding DNA.

papers" after the preliminary hearing but never went over the discovery materials with him. Ms. Williams mailed copies of these materials to him before the trial date. On the day he was arraigned in Morgan County on the rape charges, Ms. Williams talked to the petitioner in the presence of his mother and sister and told them that the State did not have anything, that it was just the victim's word against his past conviction record. From the time he was indicted in Fentress County until the day of trial, the petitioner told Ms. Williams he did not want to accept any plea offers. He stated that she never came to the jail to prepare him for trial and only mailed offers to him. Ms. Williams's associate only saw him once, a couple of days before the trial, but did not assist him with any trial preparation. However, the associate told him that he had a good chance of beating the case.

According to the petitioner, Ms. Williams brought him five or six plea offers on the day of trial. He told her not to bring any more. Ms. Williams then brought in his mother, who was crying. He described his decision to plead guilty as follows:

> A. [T]hen she [Ms. Williams] come [sic] out here and got my mother – got my mother back there crying in my face, bawling – and I couldn't take it. I wasn't going to sit there and break my mother down just to please everybody else, so I went ahead and signed it and I told her – I am going to think about you the whole twelve (12) years I am down there, and try to prove you wrong. Well, I got out here, the Judge was asking me all kinds of questions and I was saying – yes, sir, to every one of them. It didn't matter what he said, I said – yes, sir. There's a few that I said – no sir. But I was looking through all of them papers, I was looking for these DNA tests, and she said they had a – it was 99.9% mine – and because of them, I would be found guilty.
>
> . . . .
>
> Well, she [Ms. Williams] mentioned it [DNA tests] once after the preliminary hearing and said they was [sic] inconclusive and then the day of the trial, after – right before she went out here and got mom, she said – Randy, they are 99.9% yours. She said – if you go out here, they are going to find you guilty, and I said – Kelli [sic], I am not taking a plea bargain. I ain't telling you no more, and then she said – well, I think you mother is out there somewhere, and I said – we don't need my mother back here, I done told you – no. And she come out here and found mom and brought her back there and after about twenty (20) minutes of sitting there watching my mom bawl, I went ahead and took it.

-9-

Q.  [D]uring the plea hearing, Judge Asbury asked you a whole series of questions, and among those questions was – are you satisfied with your lawyer . . . – and you said – yes.

A.  At the time I felt I had no choice. . . . I have never been to no [sic] trial. I have been up here and pleaded out (sic) a bunch of times, but I had never been in no [sic] trial.

On cross-examination, the petitioner testified that he knowingly lied under oath when he told the trial judge that he was satisfied with his trial counsel's representation and that he had not been pressured in any way to plead guilty. He stated that, if he had gone to trial and testified, he would have admitted to having sex with the victim on two different occasions. The petitioner admitted that the question in the case centered around whether the sex was consensual or forced, and the blood tests would not have shown anything on that issue. He stated that he knew this when he pled guilty. His lawyers never told him that the blood tests would show whether he raped her or not. The petitioner admitted that he shook the prosecutor's hand after the plea was entered and thanked him.

After reviewing all of the evidence and exhibits, the trial court found no merit in the petitioner's allegations that his attorney failed to conduct an adequate investigation of his case, failed to raise issues, provided incorrect information, or pressured him into pleading guilty. The post-conviction petition was dismissed by order on May 22, 1998. The petitioner filed a timely notice of appeal.

## ANALYSIS

### Standard of Review

Because the petitioner filed his *pro se* petition on February 28, 1997, it is governed by the 1995 Post-Conviction Procedure Act. At the evidentiary hearing on such a petition, the defendant bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.), perm. app. denied (Tenn. 1998). Clear and convincing evidence means that there is "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks, 983 S.W.2d at 245 (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, we are bound by the trial court's findings of fact unless the record preponderates against those findings. Hicks, 983 S.W.2d at 245.

The petitioner's allegations of ineffective counsel stem from claims that Ms. Williams misled him about the evidence and did not properly prepare his case. He also claims that she coerced his guilty plea through his mother. Because the analysis of these two issues differs, we will treat these separately. After a careful review of the record, we hold that Ms. Williams was effective counsel and that the petitioner's guilty plea was voluntary and knowing. Therefore, we AFFIRM the trial court's denial of the petitioner's post-conviction petition.

-10-

**Ineffective Assistance of Counsel**

Our review of the trial court's findings as to the claims of ineffective assistance of counsel is *de novo*, since the issue involves mixed questions of law and fact. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

When ineffective assistance of counsel is alleged, a convicted defendant must show two things before a reversal of his conviction is required: (1) that counsel's performance was deficient and (2) that such deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). To prove deficient performance of counsel, the defendant must show that counsel made such serious errors that he or she was not functioning as counsel envisioned by the Sixth Amendment. Id. This inquiry focuses on whether counsel's assistance was reasonable under the circumstances and is treated very deferentially by the court. Id., 466 U.S. at 688-89, 104 S. Ct. at 2065. There is a strong presumption on appeal that counsel's conduct falls within the range of reasonable professional performance, and we must evaluate counsel's performance from his or her perspective at the time of the alleged error in the context of the totality of the circumstances. Hicks, 983 S.W.2d at 246. In Tennessee, the evidence showing that an attorney failed to prepare a sound defense or to present witnesses must be substantial before ineffective assistance of counsel will be found. Id.

To prove prejudice, the defendant must show that counsel's errors were so serious that he was deprived of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, even if error occurred by counsel, a conviction is not to be set aside if the error had no effect on the outcome of the trial. Id., 466 U.S. at 691, 104 S. Ct. at 2066; Goad v. State, 938 S.W.2d 363 (Tenn. 1996). When a guilty plea is involved, as in the present case, the defendant must show prejudice by establishing that he would not have pled guilty and would have insisted on going to trial "but for" his counsel's errors. Hicks, 983 S.W.2d at 246.

The record in the present case supports the trial court's finding that Ms. Williams acted as effective counsel in preparing the petitioner's case for trial. Ms. Williams unsuccessfully attempted to get information from the petitioner and his family that would support his contention that the victim voluntarily went with him and that sex with the victim was consensual. At the post-conviction hearing, the petitioner testified that one of the witnesses that he apparently felt could help his case was Danny Stephens, the employee from the gas station, who gave a written statement that outlined what his trial testimony would have been. Not only would the testimony of this witness not exculpate the petitioner, it supported the victim's version of the events and was very damaging to the petitioner. It was Mr. Stephens who witnessed the second forceful taking of the victim and called the police with the license plate number of the car the petitioner was driving. He also could identify the petitioner as someone he knew previously. The petitioner's theory of being "set up" by the victim was not supported by the evidence. Ms. Williams reviewed witness statements, medical reports, and other evidence that the State was going to use in its case. Accordingly, we conclude that the allegations in this regard as to ineffective assistance of counsel are without merit. Baxter v. Rose, 523 S.W.2d 930, 932-33 (Tenn. 1975).

-11-

There is also nothing in the record that leads us to believe that Ms. Williams or her associate misled the petitioner about the evidence in his case. Although the petitioner and his mother asserted that Ms. Williams and her associate told them that DNA testing confirmed that the petitioner had sex with the victim, the attorneys stipulated to the trial court after hearing the taped conversation with Ms. Williams's associate that there was no mention of DNA tests. We fail to see why this would have made a difference in the trial in any event. The petitioner never denied having sex with the victim but only alleged that it was consensual. Accordingly, we concur with the trial court's findings that the petitioner was afforded effective assistance of counsel.

## Guilty Plea

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. Boykin, 395 U.S. at 242, 89 S. Ct. at 1711. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Since the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05. If a plea is found to have been knowing and voluntary, the defendant waives any challenge of the offender classification or release eligibility. Pettus, 986 S.W.2d at 543.

In its findings on the plea agreement, the trial court held:

> [I]t should be noted that the plea agreement worked out by defense counsel, including charges in an adjoining County with concurrent sentencing, which defendant has so far refused to consummate, was very advantageous to petitioner in comparison to sentences he could have received. This Court has no doubt that any defendant confronted with charges and proof of the kind present here is in a

-12-

pressure packed situation created, not by an attorney, but by the facts and circumstances of the case. It is the lawyers' duty to point out the factual situation, the possible sentences, the likelihood of conviction or the likelihood of acquittal and to make recommendations to the defendant. The proof in this case shows that this process was carried out and petitioner decided to accept the plea bargain.

Further, Exhibit #1 (Transcript of Guilty Plea Hearing) clearly shows that defendant was fully advised and showed no hesitation in entering the guilty plea. The irreconcilable conflict between petitioner's sworn testimony in Exhibit #1 and his testimony at the post conviction hearing destroy[s] any semblance of creditility [sic].

We agree with the conclusions of the trial court. The petitioner has pled guilty to a number of charges in the past and has substantial familiarity with this process. The record shows that he was advised by his attorney that he would be convicted on the evidence and would likely receive a much longer sentence than he was being offered by the State. The petitioner's mother had been intimately involved in the entire process, apparently with the approval of the petitioner, and was also advised of the substantial risk the petitioner would take in front of a jury. She was understandably upset and concerned about the prospects her son faced. The petitioner testified that he basically pled guilty to spare his mother. However, he had already signed the plea agreement three days prior to seeing his mother crying on the day of trial and had adequate time to reflect on this decision between the time he signed the plea agreement and the day he entered his plea. The petitioner had adequate information in front of him at the time he entered the plea to make an intelligent choice between his options and obviously did so to avoid a greater sentence. See Hicks, 983 S.W.2d at 248. Likewise, the petitioner's statement that he had no choice but to plead guilty does not necessarily indicate coercion. His feeling could likely have resulted from an awareness of the risky and undesirable prospect of going in front of a jury. See id. He testified under oath at the plea proceeding that the decision to plead guilty was his own and that he was not pressured to do so. If the petitioner felt coerced into pleading guilty, he had the opportunity at that time to make this known to the trial judge. In addition, the plea agreement was extremely beneficial to the petitioner when compared to the probable sentences he might have received had the matters proceeded to trial. This issue is without merit.

## CONCLUSION

Upon careful review of the record, we conclude that the evidence does not preponderate against the trial court's findings that defense counsel was effective and that the petitioner's guilty plea was voluntary and knowing. We, therefore, affirm the judgment of the trial court in dismissing the petitioner's petition for post-conviction relief.